### IN RE WILL OF MILTON R. LOWE.

(Filed 6 October, 1920.)

**Wills—Caveat—Undue Influence—Suggestions to Make Will—Physicians.**

    A suggestion by a physician to his patient to write a will, after telling him he would not live, is not evidence of undue influence to set aside the will made in consequence, when the mental condition of the testator was sufficient at the time, and he, without intimation from the physician or others, selected the beneficiaries and gave each of them the portion of his estate they were to take.

BROWN, J., concurring; WALKER, J., dissenting; ALLEN, J., concurring in dissenting opinion.

APPEAL of caveators from *Stacy, J.,* at January Term, 1920, of PERQUIMANS.

Caveat to the will of Milton R. Lowe, heard before *Stacy, J.,* and a jury, at January Term, 1920, of Perquimans. The jury found that the execution of the paper-writing purporting to be his last will and testament was not procured by fraud and undue influence, as alleged by the caveators, that at the time of its execution he had sufficient capacity to execute the same, and that the said paper-writing, and every part thereof, was the last will and testament of Milton R. Lowe. Judgment accordingly. Appeal by caveators.

*Ward & Grimes, Charles Whedbee, and Ehringhaus & Small for propounders.*

*Aydlett & Simpson and Meekins & McMullan for caveators.*

CLARK, C. J.   The testator, a bachelor 62 years of age, died 31 October, 1918, leaving neither brother nor sister, and by this will devised his property to his nearest living kin, Mrs. Jordan and daughters, one of whom was an invalid, and her son, with a family.   He also left $1,000 each to two churches in the county, of the communion to which he belonged, and $500 to the widow of another cousin.   His other relatives were the children of other first cousins of whom there were eight, all of whom predeceased him, some of them having moved away, and some leaving no children.   The testator lived much to himself, and for the last five or six years was not in good health.

The will was written by a member of the bar in good standing, whose testimony, together with that of a tenant who lived on his land a few hundred yards from him, if believed, showed the testator was entirely uninfluenced, and was possessed of a sound and disposing mind when he executed the will.   He was taken ill on 29 September with pneumonia. On 17 October his physician informed him that he could not live, and suggested that he write his will, and thereupon he sent for a lawyer, who drew the will under his directions, and, according to the testimony, entirely without suggestion from any one.   Testator died 31 October. The attack is made by collateral relations on the father's side, Mrs. Jordan being his only living first cousin, and was on the mother's side.

There was conflict of evidence as to his competency to make a will, which the jury found in the affirmative.   The sole allegation as to undue influence was that the physician who had attended him for years suggested to him that he should make a will, and was closeted with him with the doors shut for a few moments.   There is no evidence to show that at any time the physician suggested to him any provision in the will, and he testified that he did not.   The physician was not devisee in the will, but was designated therein as his executor.   He was not present when the will was written.

There are many exceptions and voluminous testimony, but the law involved is practically reduced to one point, which is that the court instructed the jury that if they should find that the physician merely suggested to the testator the making of his will, but did not suggest how he should make it, nor any of the provisions therein, that this would not be undue influence.   If merely to advise a friend to make a will invalidates it, many wills will be made void.

"The influence which is exerted merely to induce the making of a will, while leaving the testator free from influence as to the provisions thereof, is not undue influence in the legal sense."   *Struth v. Decker,* 100 Md., 368.

In re Lowe.

"Mere advice or suggestion, where directed only to the making of a will, in general, does not constitute undue influence unless so strongly and persistently urged that the testator was unable to resist the adopting it." 40 Cyc., 1146, and notes 57 and 62. "A will is not executed under undue influence because a person, at instance of beneficiaries named therein asks the testator to make a will when nothing was said by them to such person, or by him to testator, as to what the will should contain." In re Seagrist, 37 N. Y. Supp., 496; Aff. 153 N. Y., 682.

After the fullest consideration of all the exceptions, we find

No error.

BROWN, J., concurring: I did not have the advantage of hearing the argument in this case, but as my brethren are equally divided, from necessity I must give the casting vote.

After a careful examination of the record and briefs, I am convinced that there is no evidence of undue influence. It is therefore immaterial whether his Honor erred or not in his instruction upon the first issue, the jury having found in response to the second issue that the testator had mental capacity sufficient to execute the will. The contention is that the undue influence was exerted by Dr. Smith in an effort to induce the testator to make a will. There is evidence that the physician advised the testator that he could not probably recover and pressed upon him the necessity of making a will, and that the physician brought a lawyer to the testator for that purpose. There is not a scintilla of evidence that Dr. Smith exerted any influence whatever as to what disposition the testator should make of his property. Not a single devise appears to have been the result of even a suggestion upon the part of the doctor. There is no evidence that the influence of the physician was of such an overpowering kind that it subjugated the mind of the testator and made him express the will of the physician rather than his own. It seems to be very generally held that advice or suggestion do not constitute undue influence unless they are so strongly urged that the testator is unable to resist adopting them. Yorty v. Webster, 205 Ill., 630; Herbert v. Long, 15 Ky., 427; O'Brien's Appeal, 100 Me., 156.

This rule is especially true where the suggestion is directed only to the making of a will in general, and not as to what it should contain. It is not contended that Dr. Smith exerted his influence in favor of any particular person. There is not a scintilla of evidence that he exerted any influence whatever in shaping the disposition made of the testator's property. It is contended that when he urged the testator to make a will that he was using his influence adversely to the interest of the heirs at law. I am not impressed with the force of this suggestion for the reason that the testator had a perfect right to devise his property to his

heirs at law if he saw fit to do so. There is nothing in the record tend-
ing to prove that there was any influence exerted upon the testator to
prevent such devise.

The testimony of Mr. Whedbee, who wrote the will, and who is a
lawyer well known to be of the highest personal honor, indicates clearly
that the testator knew to whom he was giving his property, and the
extent of his benefactions. He remembered the churches that he was
associated with and the parties nearest in blood and affection. The rela-
tives to whom he gave his property, as soon as they heard of his sickness,
came from a distance and braved the dangers attendant upon his disease.
They stayed with and nursed him, though one of them was herself an
invalid. These objects of his bounty were not with him at the time, and
never knew of the execution of the will until after it was made.

I am of the opinion that the judgment should be affirmed.

WALKER, J., dissenting: It is not possible for me to assent to the
last proposition stated in the opinion of the Court, that where the
execution of a will is caused by undue influence it does not invalidate it,
unless also it extends to the provisions of the instrument, and I do not
think that the authorities cited by the Court sustain the principle now
distinctly asserted, for the first time. Although the undue influence may
be confined to the mere making of the will, it must be seen at once that
the provisions in it would not have been made had its execution not
have been induced wrongfully. The prejudice is to those heirs, who, by
the destruction of the course of descent, are disinherited by the will. If
the testator had made the will by reason of fraud or duress, the principle
must be the same as if it had been by undue influence. Any difference
must be in kind, and not in degree, the result being the same. A man
may make a will under duress, or the fear of physical injury threatened
by another if he does not, and may provide therein only for particular
persons, not being induced to favor them by any special undue influence
exercised for the purpose of having the particular devise, or bequest,
made, when the testator did not want to make a will at all, but wanted
his heirs to have his property. In such a case, his act is not voluntary.
He chose to make it as he did because he was compelled to make a will,
and yet if he had been allowed to follow his own inclination there would
have been no will, and consequently no devise. The heirs are just as
surely deprived of their inheritance wrongfully as if the wrongdoer had
coerced him to make a particular disposition of his property. Any other
doctrine would be an extremely dangerous one. A man should be per-
fectly free in the entire process of disposition. This case is a striking
illustration of the correctness of my position. The testator here was not
satisfied with the will, and so stated himself, and expressed his sorrow

at having made a will at all. He was acting throughout under the effect upon his will power which was caused by the undue influence, and this was as effectual to subject it to that influence as if the undue influence has been exerted only to cause a special disposition of his property.

In the *New York case,* cited by the Court (37 N. Y. Suppl., 496), there was no undue influence exerted to have the testator make the will; he merely requested the making of the will by the testator, but not unduly. The head-note is thus: "A will is not open to the objection of having been executed under undue influence because, at the request of beneficiaries named therein, a person asked testator to make a will, nothing being said by them to such person, or by him to testator, as to what the will should contain." And the same was the ruling in the *Maryland case* (100 Md., 368), as the influence employed to induce the making of the will was not undue, because undue influence is a coercion produced by importunity, or by a silent, resistless power, which the strong will often exercise over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear; whatever destroys free agency, and constrains the person whose act is brought in judgment to do what is against his will, and what he would not have done if left to himself; that which overpowers the will without convincing the judgment; an influence which acts to the injury of the person who is swayed by it, or of those whom he would, if left to himself, have benefited. 39 Cyc., 681-682. We said of this undue influence, that to constitute such influence it is not necessarily required that there should exist moral terpitude, or even an improper motive; but if a person, from the best of motives, having obtained a dominant influence over the mind of the grantor, thereby induces him to execute a deed or other instrument materially affecting his rights, which he would not have made otherwise, exercising the influence obtained to such an extent that the mind and will of the grantor is effaced or supplanted in the transaction so that the instrument, while professing to be the act and deed of the grantor, in fact and truth only expresses the mind and will of the third person, the actor who procured the result. *Myatt v. Myatt,* 149 N. C., 137, 141; 62 S. E., 887. Undue influence exists wherever, through weakness and dependence, or implicit reliance by one on the good faith of another, the latter obtains an ascendancy which prevents the former from exercising an unbiased judgment. *Caven v. Agnew,* 186 Pa. St., 134, 328; *In re Douglass,* 162 Pa. St., 567, 569. There can be no fatally undue influence without a person incapable of protecting himself as well as a wrongdoer to be resisted. *Latham v. Udell,* 38 Mich., 238, 242. Undue influence means wrongful influence. But influence secured through affection or persuasion is not wrongful. *Sears v. Vaughan,* 230 Ill., 572, 589; *Dowie v. Sutton,* 227 Ill., 183, 197; *Burt v. Quisenberry,* 132 Ill., 385, 399.

But in the New York and Maryland cases, there was no undue influence practiced to induce the making of the will, so that the question did not arise, but the context of those decisions indicate that, if there had been undue influence, the Courts would have held the wills to be void. I have searched most carefully and exhaustively to find a case in the reports, or an intimation in the text-books, to the effect that undue influence employed to force the making of a will, without any being exerted to shape its provisions, will not invalidate the instrument, but my search has been in vain, and I can safely affirm that no such case or authority can be found at all, and, at least, no such well considered precedent.

The effect of the ruling here will be to say that if a man makes his will while under the control of undue influence, it will not be set aside, if the influence did not govern him in the disposition of his property, when, if he had not made the will at all, the heirs would not be deprived of their inheritance, because no disposition of his property would have occurred. It follows that the undue influence indirectly caused the particular disposition of his property to be made, and this being both logically and practically true, how can it make any difference whether the disposition of it was caused directly or indirectly by the wrongful influence.

The judge charged the jury against the view I have taken of the matter, when there was evidence to show undue influence in procuring the execution of the will alone, and in this there was error prejudicial to the caveators. I do not mean to imply that there was no evidence of undue influence exerted to control the provisions of the will in favor of certain persons, for I think there was, and strong evidence of such wrongful and illegal conduct, but I have sought to confine myself to the instructions as to the making of the will itself without regard to its contents or the special disposition of testator's property, for the court charged plainly and emphatically that such influence would not be undue and would not vitiate the will. This, in my opinion, was palpable error, because the result was the same even if the physician did not go beyond this and unduly induce the testator to will his estate in a particular way. I am so sure in my mind of this being the law, that I might well stop here and rest my dissent solely upon this ground. There is evidence that the testator had persistently pleaded to have the will returned to him that he might destroy it, as he regretted that he had made it, showing that he was unwilling that his property should go as the will directed, and even if he wished only to change it, as propounders contend, how, and in what way, did he wish to change it. He could not even change it very well unless he gave a different direction in his will, that is, to his last desire as to the disposition of his property. Morphine was ad-

ministered to him for the ostensible purpose, as caveators contend, that his nerves and sensibilities might be deadened, so that he might painlessly pass through what would otherwise have been to him the terrible agony of death. All the circumstances attending the execution of this will cast a grave suspicion upon the transaction, and there was more than ample evidence that it was not the will of the testator. When he had passed from under the baneful influence and regained possession, as well as he could, of his normal faculties, and of his self-control, his first appeal was for the document which wrongly expressed his last and true desire, that being for a just and fair distribution of his property among those of his blood according to the provisions of the law, which he thought was sometimes wiser than testator's, as it often is in many instances. Such a disposition of his property was, at least, more in consonance with his wishes, and his sense of justice and right.

It will better illustrate my view if I make reference here to some of the outstanding facts in this very important case:

Milton R. Lowe, the testator, died on 31 October, 1918. At the time of his death he was a bachelor, 62 years of age. Practically all of his life he had lived alone, having hardly had any association with others. During the last five or six years of his life he had been in extremely feeble health; suffering from Bright's disease, a dilated heart, and fainting spells, and lapses of memory, and being in a generally debilitated condition. On 29 September he was stricken down with pneumonia, which shortly afterwards was complicated with gangrene of the lungs, and he was "from the first as sick a man as ever died." During the whole period of his sickness he was very weak, and grew progressively worse, being unable to raise himself in bed, and speaking to those about him only occasionally when aroused temporarily for some purpose, or to make some request. On 17 October he was informed by the doctor, who had been his confidential physician for years, and who attended him during his last illness, that he was bound to die. This greatly excited the testator, and his whole soul and mind seemed to be concentrated with fear and anxiety upon the hereafter, without further thought of earthly things. On the same day the doctor, having administered professionally to the needs of the testator, came out of the sick room on to the porch, and inquired of testator's nurse and male attendance if he ever made a will. Being informed that he had not, the doctor then inquired who were his nearest relatives, and having been misinformed that the Jordans, the propounders, were his nearest relatives, requested the attendants to remain away from the sick room as he wished to have some talk with the old man. The doctor then returned to the sick room, and, contrary to his usual custom, closed the door, presumably so that they on the porch could not hear. He remained in the sick room on

this occasion about thirty minutes. During this time he was heard to repeatedly and insistently urge upon the testator that he make a will. The testator was repeatedly heard to protest against making a will, stating that he would wait until he was better, and that if he then decided to make a will, it would be all right. Parts only of this conversation were heard by the witnesses. On the next day the doctor returned, bringing an attorney with him. On this occasion he again, after administering professionally to the testator, requested the attendants to remain outside of the room, and again closed the door. On this occasion he remained with the testator about forty minutes, and was heard again urgently and repeatedly insisting that the testator make a will. Testator was again heard protesting, as on the first occasion. After about forty minutes of this colloquy, the doctor emerged from the sick room, and in response to an inquiry from the attorney, stated that the testator had decided to make a will. The attorney then, very properly, went into the sick room, and wrote the paper-writing propounded as the testator's will; the testator naming as his chief beneficiaries those who the doctor had been misinformed were his nearest kin, and naming the doctor as executor. During the writing of the will, the doctor was constantly present, and after it was signed and witnessed, the testator, who had been raised bodily in bed for the purpose of signing it, folded it and handed it to the doctor, who immediately bade the testator farewell. On the night before the will was written the testator seemed to be unusually nervous and upset, and was heard praying, muttering, and moaning to himself all night. During the ten days which elapsed between making the will and the death of the testator, he repeatedly told witnesses that the doctor had caused him to make a will, which he didn't intend to make; that he wished to get hold of it to destroy it, and furthermore made statements repeatedly that he had always liked the doctor before, but didn't like him now. He further told one of the witnesses that the doctor had told him during the two conversations aforesaid that if he didn't make a will his heirs would be litigating over the property, and the lawyers would get half of it. All the property owned by the testator at his death he got from his father, with the exception of one farm, which he purchased with the accumulations from his father's property. His heirs at law and next of kin were two first cousins on his mother's side, a child of another first cousin on his mother's side, and the children of six first cousins on his father's side. All of his kindred on his father's side were disinherited, and all upon his mother's side except Mrs. Louisa Jordan, one of his first cousins on his mother's side, and her four grown children. Of those disinherited upon his father's side, there were several sets of minor children; some nearly, and some absolutely dependent; while the Jordans

were not only possessed of some little property, but three of them were earning good salaries. At the time of the testator's death, the Jordans had been living in Norfolk, Va., about a year, during which time the testator had not seen them.

This recital of only some of the facts, there being others which reinforce them, shows how necessary it was that the charge of the judge should have been given with careful and clear discrimination, and how fatal to the caveators was the instruction as to undue influence, which was merely exerted in securing the making of the will.

Lastly, let me say, that testimony of the doctor as to the mental capacity of the testator, and relevant to that issue, was permitted, by inadvertence, of course, to be used on the issue as to undue influence, and evidence as to undue influence was permitted to be given by him, when he was an incompetent witness, all against the objection of the caveators. It is difficult sometimes to separate the testimony and assign each part of it to its proper place and function, but it must be done, else the jury will be free to decide the issues upon incompetent evidence. What the person, whose mental condition is in question, says may be considered by the jury as evidence of such condition, although it is not competent as evidence of the truth of what he says, and the court should carefully discriminate between the two, but the evidence should be admitted, as to the state of his mind and his capacity to make a will, deed, or contract, or to commit a crime (*capax doli*), even though his statements may be self-serving, or otherwise incompetent as evidence of their truth. Sometimes, and very generally, the falsity of them is the very thing that indicates aberration of the mind or impaired mental faculties. If it is expert testimony that is resorted to for the purpose of showing mental condition, the witness must be allowed freely to state not only what the subject stated to him, but what he did, so that the value of his opinion may the more clearly appear. This is elementary learning, and hardly calls for the citation of authority. Rogers on Expert Testimony (2 ed.), pp. 479, 480; especially the opinion of *Justice Washington* in *Lessees of Hoge v. Fisher,* 1 Peters' C. C. (U. S.), 163. The value of the expert's opinion depends very largely upon his opportunities for seeing and conversing with the person whose mental condition is the subject of inquiry, as appears in the authorities cited, and as common sense suggests, but while this is true, the judge should most carefully instruct and caution the jury not to consider the testimony in the light of evidence as to facts detailed by the witnesses, but only as bearing upon the question of mental condition. These principles are strongly supported by the clear and emphatic language of *Chief Justice Smith* in *McLeary v. Norment,* 84 N. C., 235, a case which has been much cited and approved by this Court. He said: "The conversation offered was

not to prove any fact stated or implied, but the mental condition of the plaintiff, as declarations are received to show the presence of disease in the physical system. How, except through observation of the acts and utterances of a person, can you arrive at a knowledge of his health of body and mind? As sanity is ascertained from sensible and sane acts and expressions, so may and must conclusions of unsoundness be reached by the same means and the same evidence. The declarations are not received to show the truth of the things declared, but as evidence of a disordered intellect, of which these are the outward manifestations. The admissibility of the witness's opinion, resting, as it necessarily must, upon past opportunities of observing one's conduct, requires, in order to a correct estimate of the value of the opinion, an inquiry into the facts and circumstances from which it has been formed. There seems to be no sufficient reason for receiving the opinion and excluding proof of the facts upon which it is founded." One of the last cases affirming it is *Bissett v. Bailey,* 176 N. C., 43, where the point here considered is stated and fully explained with reference to *McLeary v. Norment.* The case .of *Bissett v. Bailey, supra,* is also authority to the effect that such testimony is not competent in cases when the issue is as to undue influence and the witness is interested in the event of the action, testifying to transactions or communications with the deceased, citing *Hathaway v. Hathaway,* 91 N. C., 139; *Linebarger v. Linebarger,* 143 N. C., 229; *Bunn v. Todd,* 107 N. C., 266; and especially *In re Chrisman's Will,* 175 N. C., 420, where the point was directly raised and decided, *Justice Brown* writing the opinion.

. There are other exceptions to evidence and to the charge deserving attention, but to consider them in detail would extend this opinion far beyond its proper limits. The principal error is the instruction we have already fully considered as to undue influence merely in the making of the will.

The testator at the time he signed the instrument had been greatly wasted by disease, which had well nigh sapped his vitality. He was entirely too weak even to resist persuasion or importunity, and certainly not strong enough to overcome the dominating influence of one who had all his faculties unimpaired, both mental and physical, and who had been his attending physician. He was verily fast approaching the shadow of death, almost in its immediate presence, as he had been advised, and was much agitated and unnerved by his sudden knowledge of it. He was in no condition to act with a proper sense of his duty to those who were entitled to favorable consideration in the disposition of his estate. His declaration that he did not want to make a will, and his call for the will that he might destroy it, or even change it, showed plainly that undue influence had done its work, and that his free agency

had been subdued by a superior power operating upon him, when he was as clay in the hands of the potter, ready to yield without any attempt at opposition to any request as to what he should do. I do not say that those were the facts, but that there was strong evidence of them, which was rendered of little or no force by the errors committed. There is evidence, which if believed, shows that the instrument was not his voluntary and untrammelled act, as a will should be, but the product of another's will, to whose every suggestion he had readily submitted.

I am greatly perplexed to understand how it can be successfully asserted, or maintained, that there is no evidence of undue influence to make the will, when the record is replete with such evidence. It cannot be said that the making of the will was not unduly influenced and procured. His Honor assumed that there was evidence of it when he gave the instruction. There is not only ample, but abundant evidence of it, and the cries of the testator that the paper be restored to him, so that it might be canceled or destroyed, is not the least of it. It was not by any means a mere suggestion to the testator to make the will, but far more than that. Many wills have been set aside upon far less evidence. Of course, the testator could will his estate to his heirs, but he did not do so, and if he had done so, they would still take as heirs, as if by descent. He willed it to some of his heirs, but not, in a natural way, to those in the paternal links, who would have taken it, had he not made a will, as it would have gone to those who were of the blood of the first purchaser, his father, and they have been prejudiced. By undue influence in procuring the making of the will, that line of descent has been ignored.

Suggestion, or fair persuasion, which does not subject the testator's will to that of a third person, making it the will of the latter and not that of the testator, will not, of course, do. That is not this case, but a very different one. The declarations of the testator show what influence had been exerted upon him. Nothing could manifest it more surely.

The effect of the instruction is that, if the execution of the will was "unduly influenced" by the physician, and he was appointed executor by reason of it, his appointment would be void, but the will would still be valid, if the disposition of the testator's property was not unduly influenced, which was exactly the same as saying that, if the making of the will was obtained by undue influence, the will would nevertheless be valid unless the particular disposition of his property came under the same influence and was induced by it, except as to the executor's appointment.

My conclusion is that there should be another trial of the case for the errors pointed out.

ALLEN, J., concurs in the dissenting opinion of WALKER, J.