In re WILL of MRS. SUSAN A. HURDLE.

(Filed 7 October, 1925.)

1. **Wills—Caveat—Issues—Undue Influence — Instructions—Evidence— Appeal and Error—Presumptions.**

Upon a single issue of *devisavit vel non* on a trial to caveat a will, whereupon both the mental capacity of and undue influence upon the testator were in question with verdict in favor of the caveators, it will not be assumed that the trial judge, on the propounder's appeal, correctly instructed the jury, when the evidence on the question of undue influence is not sufficient to sustain the verdict on the single issue.

2. **Wills—Caveat—Undue Influence—Evidence—Instruction—Appeal and Error.**

Where the testator has devised her estate to the church, and the only evidence upon the question of undue influence involved in the action is the frequent visits of her pastor, that she was a generous and devoted member of the church, and had no love or affection for her heirs at law, the caveators in the present action, it is legally insufficient to show that her mind in making the will had been supplanted by the controlling will of another under the rule of law applicable, or support an affirmative answer to the issue.

APPEAL by propounders from *Sinclair, J.*, at April Term, 1925, of EDGECOMBE.

Issue of *devisavit vel non,* raised by a caveat to the will of Mrs. Susan A. Hurdle. Alleged mental incapacity and undue influence are the grounds upon which the caveat is based.

The jury returned the following verdict:

"Is the paper-writing offered in evidence the last will and testament of Susan A. Hurdle? Answer: No."

From a judgment on the verdict in favor of caveators, the propounders appeal, assigning errors.

*R. T. Fountain, Geo. M. Fountain, W. S. Wilkinson and B. E. Fountain for caveators.*

*F. S. Spruill, S. McIntyre, J. M. Broughton and W. O. Howard for propounders.*

STACY, C. J. There is but one serious exception appearing on the record: Did the court err in submitting the question of undue influence to the jury? A careful perusal of the evidence leads us to believe that this question should be answered in the affirmative and that a new trial must be awarded.

The evidence is plenary and conflicting on the question of alleged mental incapacity, and we would have no difficulty in sustaining the

validity of the trial, if the two issues of alleged mental incapacity and undue influence had been submitted separately, but the whole case was tried on the single issue of *devisavit vel non,* as above set out.

It may be conceded, for the purposes of the present appeal, that the question of undue influence was submitted to the jury under proper instructions from the court, if the evidence warranted the instructions, but we are unable to find any evidence on the record sufficient to require the submission of this question to the jury.

In the paper-writing propounded, and which was executed 5 January, 1922, the testatrix, after making certain bequests to her husband and other relatives, left the bulk of her property to the North Carolina Baptist Foundation in trust for Home and Foreign Missions and the Baptist Orphanage. She died 7 November, 1923, without leaving any child or children her surviving. She was greatly devoted to her church and Sunday school. Her will was witnessed by her pastor, Rev. W. O. Rosser, and Annie E. Combs, daughter of C. H. Spivey, one of the caveators.

A prior will, with practically the same provisions as the last one, except as to the amount to be used for missions, was executed by the testatrix in 1913. This will was witnessed by C. W. Austin and W. P. McDowell.

Seven witnesses were offered by caveators to support their allegation of undue influence. As bearing on this particular question, they testified as follows:

C. H. Spivey: "Q. State whether or not she was a woman whose mental condition was such that she could be influenced by others?

A. Those she thought a heap of she could very easily.

Q. State whether or not from the conversation you had with her you thought she was under the influence of her pastor, Mr. Rosser?

A. I think she was.

Q. Did you ever see him going to and from there?

A. Yes, sir; he went there right often.

I never have seen a lawyer going down to her house; I saw Mr. Rosser and other people going down there; Mr. Rosser was her pastor; I was there when she died; Mr. Rosser came after she died, he was not there when she died; I found out a few days after her death that she had made a will.

She told me that after her sister died (1904) she was aiming to give one-half of her sister's part to the Methodist, and the other to the Baptist; that was right after her sister died."

Dr. Richard Speight: "She would speak to me about the Kennedy Home and Thomasville Orphanage, but I don't recall any particular time; at the time she made that will I think she knew what she was doing. I think she could be influenced."

Mrs. G. N. Taylor: "I have seen Mr. Rosser in and out there; I know Mr. Rosser; he was her pastor at the time, but at the time of her death he was not."

E. J. Hurdle (husband of testatrix) : "She made a will about three weeks after her sister's death (7 August, 1904); from the first will she made I thought I would be provided for in the will; I did not know that she ever made but one will; after she made the first will she told me she wanted to change her will, and said, 'I want to give it all to the Baptist Orphanage.' I said: 'It is yours; you can make disposal of it as you see fit.' I did not know she ever changed that will until after she was dead.

"Mr. Rosser told me that the will was drafted at Raleigh or Winston-Salem at the Wachovia Bank and Trust Company.

"I refused to speak to Mr. Rosser for a while; I have not spoken to him up until now; he has ceased to be our pastor three or four years, a year or two before my wife died; she had strong leanings toward the church; I don't think my wife could be influenced by an official of the church; I was under the impression Mr. Rosser did use his influence along that line, but since I saw that will this morning, the 1913 will, that will was written before he was on the field, and I am sorry and willing to apologize to him and speak to him and I am sorry that I ever accused him of that fact; he came in the field around 1915 or 1916, and left three or four years ago. The Baptist Foundation offered to give me a life estate in that land because the heirs at law who brought this suit offered the same thing.

"One winter she didn't go out for 60 days; had diphtheria."

Rev. T. L. Vernon: "I think she had great confidence in her preachers and believed what they told her."

Mrs. Jennie Weeks: "She was an educated woman and conversed well on the Bible; she knew her kin folks but did not care anything about them; they didn't care much about her; she had sense enough to know what she was doing; she knew who she was giving it to and she gave it through prejudice; she didn't want her people to have it and she didn't want Mr. Hurdle to have it."

Mrs. Ellen Lane: "Q. State whether or not you saw him (Mr. Rosser) in and out of the home of Mrs. Hurdle right often?

"A. Yes, sir, when I was in the community I would see him frequently. This was during his pastorate; I talked with Mrs. Hurdle a great deal; the topic of her conversation was Mr. Rosser, because you know she talked religion more than anything else; that was her general conversation; she did talk of Mr. Rosser."

Viewing this evidence in its most favorable light for the caveators, we think the court erred in submitting the question of undue influence to the jury.

To constitute "undue influence," within the meaning of the law, there must be something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. "It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made."

In short, undue influence, which justifies the setting aside of a will, is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. *In re Mueller's Will,* 170 N. C., 28; *Plemmons v. Murphey,* 176 N. C., p. 677; *In re Craven's Will,* 169 N. C., 561. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, and which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force. To constitute such undue influence, it is not necessary that there should exist moral turpitude, but whatever destroys free agency and constrains the person, whose act is brought in judgment, to do what is against his or her will, and what he or she otherwise would not have done, is a fraudulent influence in the eye of the law. *In re Lowe's Will,* 180 N. C., 140; *In re Abee's Will,* 146 N. C., 273.

Quite apropos of the present case are the observations made in *Wingert's Estate,* 199 Pa., 430. Speaking of the insufficiency of a similar state of facts to show undue influence in that case, *Stewart, P. J.,* said:

"She was a woman of pronounced religious convictions and feelings, enthusiastic in her church life, and devoted to the denominational order to which she was attached. Kinship no closer than was hers, lacking the endearment that results from association and intercourse, would not strongly appeal, especially when other objects had become of deep and enthusiastic concern, and which in their nature suggested somewhat of religious duty. This circumstance is not to be overlooked in the consideration of the question before us, since the charge is that the paper does not express the mind of the testatrix, but is the expression of another's will which she was constrained to adopt as her own. . . .

"She had few cares and no dependents, and possessed of an estate more than adequate for her personal wants, she was in a position to be generous and charitable. No object was anywhere so near to her as her church. She had given to it freely and frequently, unable because of physical infirmity to attend public worship, she required frequent pastoral visitations in her home, and in this way she came to know many of the clergymen of her church. Her house was open to them, and her appreciation of their ministration was met by a corresponding apprecia-

tion on their part of her kindness. To her they were the saints; while to them she was Lydia of Thyatira come again. That intimate social and personal relations should exist is not surprising, and that under such experience her attachment to the church should grow stronger and her concern for nephews and nieces, few of whom she had ever seen, and with none of whom had she ever had but slight acquaintance, should grow weaker, is just what was to be expected. Yet it is the frequent and intimate association with the clergy of her church, their continual attendance upon her, and her marked confidence in and liberality towards them, which has given rise to the present charge of undue influence. The allegation is that these gentlemen, with a view to advantage the church to which they belonged, so. practiced upon the religious feelings and convictions of the testatrix, that her freedom of will was overcome, and she was constrained to make her will in accordance with their suggestions and desires. . . .

"Even though the state of the old lady's mind was as contended for, and her subjection to the influence of the preachers be established, a most material part of the case remains to be made good. Granting that she had not sufficient power to assert her own will against the will of her clerical friends, what evidence is there that the latter, or any of them, by word or act interfered in the remotest way to control the final disposition of the old lady's estate? Upon what facts could a verdict against the will on any such ground be rested?"

There is nothing in the evidence, above set out, of sufficient probative force to warrant a verdict in the instant case for the caveators on their allegation of undue influence, and, hence, the question should have been withheld from the jury's consideration. Because of the error in this respect, there must be a new trial, and it is so ordered.

New trial.